Filed 7/28/14  In re N.C. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.C. et al., Persons Coming Under the Juvenile Court Law. | |
| DEL NORTE COUNTY DEPOARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>    Defendant and Appellant. | A140372<br><br>(Del Norte County<br>Super. Ct. No. JVSQ13-6017, JVSQ13-6018) |

J.B. (Mother), mother of N.C. and M.C. (the Twins), born in January 2007, appeals from orders made at a November 2013 interim review hearing in the Twins' dependency cases.  We are familiar with the cases, because we recently decided Mother's appeals from orders at the April 2013 disposition (*In re N.C.* (May 5, 2014, A138503) [nonpub. opn.]), and orders at the October 2013 six-month review (*In re N.C.* (June 24, 2014, A140027) [nonpub. opn.]).

A central issue in the November review hearing was Mother's visitation with the Twins.  Mother argues that the court improperly delegated control over visitation to the county Department of Health and Human Services (Department), and erroneously failed to specify the minimum number of hours of visitation she would receive.  She also

1

contends that, if the court made an implied finding that she was receiving reasonable services, the finding was not supported by substantial evidence. We find no error and affirm the orders at the November interim review.

## I. BACKGROUND

As noted in our prior opinions, much of the planning in the cases was deferred pending receipt of a custody and sexual abuse evaluation conducted by Dr. Jacqueline Singer, as ordered in the parents' divorce case. The court received Singer's report after the six-month review hearing, and admitted it into evidence at the November interim review.

Dr. Singer could not definitively determine whether D.C. (Father) sexually abused the Twins as Mother has alleged. She found it "impossible to say that because the girls appear happy at their father's home, and are doing well in school that [Father] is not molesting them," and it was "possible that molest continues, though [the] girls have made no reports and are not exhibiting any troubling behavior." However, Dr. Singer thought that it was "equally, and more likely, that molest is not occurring, the children are happy and that accusations have stopped because the only contact mother has with them is closely monitored. It is noteworthy that since her visits have been at CPS, no additional allegations have been made."

Singer recommended that Father have sole legal and physical custody of the Twins. Singer had "concerns about possible abduction by [Mother] and as such she should not have legal custody." Her psychological testing of Mother revealed "considerable character pathology." Among other things, when Mother "attempts to think through problems, she can at times distort her perceptions and her understanding of others and their motives. [Mother] shows challenges in thinking clearly and having accurate perceptions. At times, her thought process can be disturbed and her thinking can be illogical. She can become disorganized around what she experiences as internal versus external, and she can attribute inaccurate motives to others."

Mother obtained court funding for a psychological assessment of her by Dr. Edwin Jenesky, which the court also took into evidence at the interim review. The court

2

explained at the hearing that it authorized Jenesky's assessment because Singer had "expresse[d] grave reservations about [Mother's] psychological ability to [comply with the case plan]," and she was entitled to another report "to level the playing field." Jenesky reported that Mother's personality could "lead to some interpersonal difficulties [that] . . . could make it difficult to work with her and lead her into misunderstandings as well as over reactions." She arrived 20 minutes late for her evaluation, and her weaknesses were "punctuality," and "misinterpreting and embellishing things in a self-serving direction." She seemed "to project blame onto others without mentioning her role in potential self-defeating behavior and contributing to difficulties," and "may have limited insight into how her behavior may have a negative effect on others." However, she was a person of "high average" intelligence who did not suffer from "severe mental illness or personality disorder," and she "appear[ed] to be capable of meeting requirements of a reunification plan and properly parenting her children."

## II. DISCUSSION

A. Visitation

    (1) *Record*

Dr. Singer's recommendations included detailed requirements and timeframes for Mother's visitation with the Twins to progress "from the current CPS supervised visits to visits at the Family Resource Center, to unsupervised at the FRC, to unsupervised in the community to overnight." Those recommendations included a requirement that Mother arrive 15 minutes before visits began. The report indicated that Mother arrived one and a half hours late to her first appointment with Singer, and was frequently late for visits with the Twins. The paternal grandmother, who drove the Twins to the visits, told Singer that Mother had missed some visits and was often late. She said, "The children are upset, and if [Mother] is more than 20 minutes late, they leave." Singer believed that Mother's compliance with the early arrival requirement "will demonstrate that she is able to get the children somewhere on time, when she is participating in activities with the children in the community and visits will be cancelled if she is not there. This way the children will not be inconvenienced by her tardiness."

3

At the interim review hearing, Mother advised that she had five hours of visitation with the Twins per week. Counsel for the Twins asked that the visitation be increased "because [Mother] has been doing quite well with her supervised visits." Department manager Markytan stated that Mother was "still between five and nine minutes late to visits," but that visitation was otherwise "going very well." The Department recommended that the court "go ahead and lift the monitoring, but keep the visits at the Family Resource Center, so there still would be a social services aide there, but not directly monitoring them at all times."

The court said, "Okay. So we're going to increase the visits. And at a minimum I want no huge bags of toys, and I want her to be fifteen minutes early." Based on Singer's report, the court denied Mother's requests for visitation in her home and on holidays. The court said, "I want to increase visitation, but I'm not ready to say mom is ready to fly without training wheels."

When Markytan said the Department did not "necessarily" agree to increased visitation, the court responded, "I want to increase the amount of time. I think that's what [the Twins' counsel] thinks is appropriate. [¶] The kids benefit from it." The paternal grandmother said it was "fine" for the court to give the Twins "more hours" with Mother, but expressed doubts about their availability for the increased visitation given their after school activities. Markytan said the Department would need to work out logistics of the visits given the FRC's hours of operations.

The court told Markytan: "Well, do it because here's the problem. If we don't increase visitation, then we're setting up failure. And we're setting up . . . the argument that the department hasn't provided reasonable services because visitation is part of the reasonable services." "The Court: Sorry, but that's what we have to do. [¶] Ms. Markytan: I'm not complaining one bit. I just simply wanted to get some clarification. But we will work to see what we can do with the time constraints of the FRC. [¶] The Court: Enhance the time. She's got to be fifteen minutes early no bags of toys. [¶] Ms. Markytan: Got it. [¶] The Court: No overnight. No unsupervised. We got to keep moving forward."

At the conclusion of the hearing, Mother's counsel said, "And just one more thing for clarification. The mother is asking for a specified amount of time that the Court can order for the visitation because she's concerned the department will just give her an extra hour as opposed to something a little more significant that sounds like [the Twins' counsel] wants." The court replied, "If she's getting five hours a week now and she gets seven or eight until we come back in January, that will work for me. Again, subject to availability. Kids have school; kids have homework; kids have dance lessons; kids have therapists to go to. It all adds up. She lives in Hiouchi. He lives in Smith River. CASA is down here, and on and on it goes. All this stuff takes time. Transportation. So do the best you can. But that's my 'expectation.' "

(2) *Review*

"It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. [Citations.] To sustain this balance the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits should occur." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) However, a court cannot delegate to any third person "unlimited discretion to determine whether visitation is to occur." (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505; see *In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1135 [same].)

Mother claims that requiring her to arrive for visits 15 minutes early ran afoul of these precedents because this condition improperly "permitted the Department to have the power to deny all visitation to her." However, there was no improper delegation of discretion to determine whether visitation would occur. Mother, not the Department, has the power to determine whether the condition will be satisfied. She will either show up at the required time or she will not. The condition grants the Department no discretion, it just requires the Department to monitor Mother's punctuality.

"[W]hen the court orders visitation, it must also ensure that at least some visitation, at a minimum level determined by the court itself, will in fact occur." (*In re*

5

*S.H.*, *supra*, 111 Cal.App.4th at p. 313.) Mother contends that the court violated this rule because it failed to specify the "total number of hours" of visitation she was to receive, and the "frequency and length of the visits." However, the court's directives were sufficiently specific. The court made it very clear at the hearing that it was ordering that Mother receive more than the five hours of visitation per week she was being given. Mother observes that the court stated at one point "Mother can have increased visitation under the terms and conditions set forth by the department as to the time." In context, this comment about the Department's control over the time of visitation referred to the timing, not the extent, of the visitation. At the end of the hearing, the court acknowledged the practical difficulties with arranging the visits, but said it " 'expect[ed]' " that Mother would begin receiving seven or eight hours of visitation per week. The minimum amount of visitation was thus made reasonably clear.

B. Reasonable Services

Mother contends that if the court found by implication she was receiving reasonable services, the implied finding was not supported by substantial evidence. The alleged deficiency was failure to provide Mother with counseling as required by the case plan adopted at the six-month review, which required her to participate in counseling with "Marla Bartow, MFT in order to develop a co-parenting plan with her children's father." At the interim review, Mother's counsel advised that Bartow was refusing to provide this counseling, "so now mom is in a position of she doesn't know what she's supposed to do to fulfill that requirement. So I'm hoping that the department will be able to figure that one out."

The court responded: "Me too. But, you know, they're obligated to provide reasonable services, but reasonable as defined by the courts of appeal is—it also has to consider what's available. I mean, here we are at the far northern corner of the State of California. This is not Santa Clara. We don't have piles of money and clinical clinicians, you know, ten, fifteen, thirty different clinicians available. We've got very few. Just like the same problem we have getting lawyers in these cases where there's multiple defendants or multiple parties. [¶] So reasonable services is based on, you know, what's

6

reasonably available. And that's part of the problem. Another part of the problem is . . . a lot of these local service providers don't want to be the next defendant in federal court.[1] [¶] So good luck, department, sorting that out. Do the best you can. That's all we can do."

Mother's argument about the lack of evidence for an implied finding lacks merit in the first instance because the court did not purport to make any findings, express or implied, about the provision of reasonable services or anything else at the interim review. The court stated early in the hearing, "This is an interim review. I'm not going to make any findings, and I haven't looked at any report other than Dr. Jenesky's and Dr. Singer's."

Nor does Mother identify any authority mandating that a reasonable services finding be made at the interim review. That finding will be required at the 12-month review in April (Welf. & Inst. Code, § 366.21, subd. (f); Cal. Rules of Court, rules 5.708 (e), 5.715(b)(2)), a fact of which the court was well aware. The court set another interim review hearing for January 24, 2014, saying, "I want to make sure we don't get to April and find out that reasonable services haven't been provided . . . ." The court's ruminations on the potential difficulty of arranging counseling for Mother did not suggest that the Department was absolved from making reasonable efforts to implement that part of the case plan.

### III. DISPOSITION

The orders at the interim review are affirmed.

---

[1]As we noted in our June opinion, county counsel apprised the court at the dispositional hearing that Mother had filed a federal suit " 'against just about everyone involved in this case.' "

7

 

                             _____

                             Siggins, J.

We concur:


_____

McGuiness, P.J.


_____

Jenkins, J.